1 | DAVID J. WEILAND #160447
Email: dweiland@ch-law.com
2 | STEVEN C. CLARK #181050
Email: sclark@ch-law.com
3 | COLEMAN & HOROWITT, LLP
499 W. Shaw Avenue, Suite 116
4 | Fresno, California 93704
Telephone: (559) 248-4820
5 | Facsimile: (559) 248-4830

6 | Attorneys for Defendant/Cross-Complainant THE NEIL JONES FOOD COMPANY, dba SAN
7 | BENITO FOODS

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 |

11 | JOSEPH VALLEJO, VICTOR ESPERICUETA
and CHRISTOPHER JONES on behalf of
12 | themselves and all others similarly situated

13 | Plaintiffs,

14 | vs.

15 | THE NEIL JONES FOOD COMPANY, dba
SAN BENITO FOODS
16 |

17 | Defendant.

18 |

19 |

20 | THE NEIL JONES FOOD COMPANY, dba
SAN BENITO FOODS
21 |

22 | Third-Party Complainant,

23 | vs.

SUNNYSLOPE COUNTY WATER
24 | DISTRICT, a governmental entity

25 | Third-Party Defendant.

Case No.: 5-24-cv-06835-NW

**THIRD-PARTY COMPLAINT AGAINST
SUNNYSLOPE COUNTY WATER
DISTRICT FOR:**

1. **For Breach of Written Contract**
2. **Negligence**
3. **Public Nuisance**
4. **Private Nuisance**
5. **Express Indemnity**

26 |

27 | Cross-Claimant, THE NEIL JONES FOOD COMPANY, dba SAN BENITO FOODS

28 | ("NJFC"), alleges as follows:

**INTRODUCTION**

1.     Plaintiffs have brought the underlying class action against Defendant, The Neil Jones Food Company (referred herein as "NJFC", "Defendant", or "Third-Party Plaintiff") for its alleged release of noxious odors onto Plaintiffs' property.

2.     Plaintiffs allege that Defendant owns and operates the San Benito Foods ("the Facility") and that said Facility releases noxious off-site odors, causing material injury to property through nuisance and negligence.

3.     Plaintiffs further allege that at "the Facility", Defendant operates a cannery where it cans fresh tomatoes and further allege that as part of this process, Defendant receives, processes, stores and transports tomatoes and the waste that results from this process (operations).  Plaintiffs further allege that "the Facility" is located at 711 Sally St., in the City of Hollister, County of San Benito, California.

4.     Defendants allege that at the 711 Sally St., Hollister, Ca., location, the primary activities consist of labeling and casing the already canned tomatoes.

5.     NJFC is and at all times mentioned herein was, the owner and operator of that certain food processing facility located at 110 Hawkins St., Hollister, California.  Defendant asserts that NJFC operates a cannery at the Facility and that as part of that process water is used, transported to, and then is processed at a wastewater treatment plant, a portion of which is leased by NJFC. The wastewater treatment plant is located at or around 1321 South Street Hollister, Ca.  NJFC further asserts that at all relevant times related to the Plaintiffs claims, the wastewater treatment and processing was performed by Sunnyslope County Water District (referred herein as "SCWD" or Third-Party Defendant) pursuant to a contract SCWD entered into with NJFC for SCWD to perform same.

**THE PARTIES**

6.     NJFC is, and at all times mentioned herein was a Washington corporation organized and existing under the laws of the State of Washington.  NJFC is, and at all times mentioned herein, qualified to do business in the State of California.  NJFC is, and at all times mentioned herein was, the owner and operator of that certain food processing facility located at 110 Hawkins St., Hollister,

1    California.  NJFC also leases a portion of a wastewater treatment facility at or around 1321 South

2    Street Hollister, Ca.

3         7.     On June 1, 2021, NJFC and SCWD entered into an Industrial Wastewater Treatment

4    Plant Operation and Maintenance Agreement which currently remains in effect.  A copy of this

5    agreement accompanies this Third-Party Complaint as attachment "A".

6         8.     On or about, September 30, 2024, class action plaintiffs filed and served a class

7    action complaint against Neil Jones Food Company alleging public nuisance, private nuisance and

8    negligence related to the operation of the San Benito Foods plant facility and the wastewater

9    treatment plant.  A copy of the allegation's portions of the complaint, accompanies this Third-Party

10   Complaint as attachment "B" and many of Plaintiffs allegations contained in attachment B are

11   restated herein.

12        9.     Plaintiffs have alleged that they are citizens of the state of California.

13        10.    NJFC is informed and believes and thereon alleges that Third-Party Defendant,

14   SCWD, is, and at all times relevant hereto was, a California public water district formed pursuant

15   to the California Water District Act found at California Government Code section 34000 et seq.,

16   authorized to conduct business in the State of California.  NJFC is informed and believes and

17   thereon alleges that SCWD is, and at all times mentioned herein was, in the business of treating

18   wastewater and operating a wastewater treatment facility and contracted with NJFC for the

19   operation of the wastewater treatment plant at issue in this case.

20                                    **JURISDICTION**

21        11.    Plaintiffs allege that this Court has original jurisdiction under 28 U.S.C. §

22   1332(a)(l) because they claim the amount in controversy greatly exceeds $75,000, exclusive of

23   interests and costs, and that there is complete diversity of citizenship between the parties.

24        12.    In support of their allegations of diversity jurisdiction, Plaintiffs assert that

25   Plaintiffs are citizens of California and NJFC is a Washington corporation.

26        13.    NJFC asserts that Third-Party Defendant, SCWD, is a public water district

27   which may affect jurisdiction if based upon diversity.

28        14.    NJFC asserts that SCWD is a necessary and indispensable party to this action.

---
3
**THIRD-PARTY COMPLAINT AGAINST SUNNYSLOPE COUNTY WATER DISTRICT**

15.    However aside from jurisdiction being based upon diversity, Plaintiffs further allege separately, and in addition to diversity jurisdiction under 28 U.S.C. § 1332(a)(l), this Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA") pursuant to 28 U.S.C. § 1332(d)(2)(a). Plaintiffs allege that CAFA jurisdiction is appropriate because there are 100 or more putative class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and one or more members of the putative class is a citizen of a state different from any defendant.

16.    Plaintiffs further allege that Venue is proper in this Court under 28 U.S.C. § 139l(b)(2) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this District, and because the property that is the subject of this action is situated in this District.

## BACKGROUND ALLEGATIONS

17.    NJFC has been in the food processing business for fifty years. NJFC owns numerous food processing plants which produce a variety of products under numerous brands, including San Benito Foods located in the City of Hollister, County of San Benito, California.

18.    NJFC owns and operates a food processing facility located at 110 Hawkins St., Hollister, California where it receives, processes and cans tomatoes for the wholesale and retail markets. As part of NJFC's tomato processing, water is used, transported to, and then is processed at a wastewater treatment plant, a portion of which is leased by NJFC from the City of Hollister.

19.    The wastewater treatment plant is located at or around 1321 South Street, Hollister, CA.

20.    NJFC further asserts that at all relevant times related to the Plaintiffs' claims, the wastewater treatment and processing was performed entirely by SCWD pursuant to a contract SCWD entered into with NJFC for SCWD to perform same.

## INTRODUCTION

21.    Plaintiffs have brought the underlying class action against Defendant, NJFC for its alleged release of noxious odors onto Plaintiffs' property.

22.    Plaintiffs allege that NJFC owns and operates the San Benito Foods processing plant

---

**THIRD-PARTY COMPLAINT AGAINST SUNNYSLOPE COUNTY WATER DISTRICT**

("the Facility") which Plaintiffs allege releases noxious off-site odors, causing material injury to property through nuisance and negligence.

23.    Plaintiffs allege that at its Facility, NJFC operates a cannery where it cans tomatoes. As part of this process, NJFC receives, processes, stores and transports canned tomatoes and the waste that results from this process (operations).

### DEFENDANT'S FACILITY OPERATIONS

24.    Plaintiffs allege that NJFC operates a tomato cannery that processes and cans tomatoes at its Facility and that these tomatoes are converted into various tomato-based products.

25.    Plaintiffs claim that the canning process produces millions of gallons of organic waste which, if not properly and expediently treated, will release noxious odors.

26.    To treat the waste created by its operations, NJFC leases a portion of the City of Hollister's Wastewater Treatment Facility.

27.    NJFC contracted with SCWD to operate the portion of the wastewater treatment facility leased by NJFC which is the subject of Plaintiffs' complaint.

28.    Plaintiffs claim that in the storing, transportation and treatment of the waste created by its cannery, NJFC causes noxious odors to be emitted into the surrounding community.

29.    NJFC contracted with SCWD to store, process and treat the waste and wastewater during all relevant times noted by Plaintiffs in their complaint.

30.    Plaintiffs allege that a properly operated, maintained, and managed Facility will collect, capture and destroy odors to prevent such odors from escaping into the ambient air as fugitive emissions.

31.    Plaintiffs further allege that NJFC is required to control its odorous emissions by, among other things, following proper practices, utilization of odor control technologies, and installing, operating, and maintaining systems for the routing, capture, removal, and elimination of the compounds that cause the emission of noxious odors.

32.    Plaintiffs also allege that NJFC has failed to follow proper practices to prevent noxious off-site odor emissions and has failed to sufficiently collect, capture, and/or treat odors generated at its Facility, or by its operations, to prevent fugitive emissions and to otherwise prevent

1  odors from the Facility from invading the homes and properties of Plaintiffs and the Class.

2        33.    NJFC contracted with SCWD to store, process and treat all the waste and wastewater

3  discharge from NJFC's processing plant during all relevant times noted by Plaintiffs in their

4  complaint.

5      **PLAINTIFFS' CAUSES OF ACTION I AND II PUBLIC AND PRIVATE NUISANCE**

6        34.    Plaintiffs allege that the noxious odors which entered Plaintiffs' property originated

7  from the Facility constructed, maintained and/or operated by NJFC.

8        35.    Plaintiffs allege that NJFC owed and continues to owe a duty to Plaintiffs and the

9  putative class to take positive action to prevent and/or abate the interference with common public

10  rights and/or the invasion of the private interests of the Plaintiffs.

11        36.    Plaintiffs allege that by constructing and then failing to reasonably repair, maintain,

12  and/or operate its Facility, NJFC has negligently created an unreasonable risk of foreseeable harm

13  by causing the invasion of Plaintiffs' property by noxious odors and pollutants.

14        37.    Plaintiffs allege that the nuisance conditions created by NJFC are continuing, as they

15  arise intermittently and can be abated with reasonable diligence.

16        38.    Plaintiffs allege that by causing noxious odors produced and controlled by NJFC to

17  physically invade Plaintiffs' land and property, NJFC intentionally, recklessly, and/or negligently

18  created a nuisance which substantially and unreasonably interfered with Plaintiffs' comfortable use

19  and enjoyment of their property and caused the values of said property to diminish.

20        39.    While NJFC denies Plaintiffs' public and private nuisance allegations, NJFC asserts

21  that it contracted with SCWD to store, process and treat all the waste and wastewater discharged

22  from NJFC's processing plant during all relevant times noted by Plaintiffs in their complaint and

23  to the extent these claims were related to those activities they would be the responsibility of SCWD.

24        **PLAINTIFFS' CAUSE OF ACTION III NEGLIGENCE**

25        40.    Plaintiffs allege that on occasions too numerous to mention, NJFC negligently and

26  improperly maintained and/or operated its Facility, allowing excessive fugitive noxious odor

27  emissions to escape.

28        41.    Plaintiffs allege that NJFC owed and continues to owe a duty to Plaintiffs and the

1  putative class, as neighboring residents with private property interests, to prevent and abate the

2  interference with, and the invasion of, their private property interests.

3      42.    Plaintiffs allege that by failing to properly construct, maintain and/or operate its

4  Facility, and follow proper practices, NJFC failed to exercise its duty of ordinary care and diligence

5  so that noxious odors would not invade and damage Plaintiffs' property.

6      43.    While Defendant denies Plaintiffs negligence allegations, NJFC asserts that it

7  contracted with SCWD to store, process and treat all the waste and wastewater during all relevant

8  times noted by Plaintiffs in their complaint and to the extent these claims were related to those

9  activities they would be the responsibility of SCWD.

10              **PLAINTIFFS' CLAIMED PUBLIC NUISANCE FINDINGS**

11     44.    Plaintiffs allege that NJFC's well-determined pattern of failing to control its

12  emissions is further demonstrated by:

13     45.    NJFC having received several Notices of Violation (NOV) from the Monterey Bay

14  Air Resources District ("MBARD") relating to its operation of the Facility and resultant odors,

15  including the following:

16         i.    Plaintiffs claim that on August 23, 2022, NJFC received an NOV for

17  "[d]ischarge of air contaminants in such quantities as to constitute a public nuisance." This NOV

18  was based on MBARD investigations performed on 8-12-22, 8-14-22, and 8-15-22, that found

19  offsite nuisance odors.

20         ii.    Plaintiffs claim that on November 8, 2023, NJFC was issued an NOV for

21  multiple violations.

22         iii.    Additionally, Plaintiffs claim that NJFC received an NOV from the MBARD

23  on April 18, 2024, for "[d]ischarge of air contaminants in such quantities as to constitute a public

24  nuisance." NJFC asserts that these Plaintiffs are claiming notices of violation from the wastewater

25  treatment plant which was operated by SCWD.

26     46.    While NJFC denies Plaintiffs' nuisance allegations, NJFC asserts that it contracted

27  with SCWD to store, process and treat all the waste and wastewater during all relevant times noted

28  by Plaintiffs in their complaint and to the extent these nuisance claims were related to those

1    activities they would be the responsibility of SCWD.

2        47.    Further, Plaintiffs claim that the invasion of Plaintiffs' property and that of the Class

3    by noxious odors has reduced the value of and interfered with the use of those properties, resulting

4    in damages well in excess of $5,000,000." (See Attachment B paragraph 39).

5        48.    While NJFC denies Plaintiffs damages claims, NJFC asserts that it contracted with

6    SCWD to store, process and treat all the waste and wastewater during all relevant times noted by

7    Plaintiffs in their complaint and to the extent these claims were related to those activities, they

8    would be the responsibility of SCWD.

9                              **FIRST CAUSE OF ACTION**

10        **(For Breach of Written Contract - Against Third-Party Defendant SCWD)**

11        49.    NJFC incorporates paragraphs 1 through 48 of this Third-Party Complaint as though

12    fully set forth herein.

13        50.    NJFC and SCWD executed the Industrial Wastewater Treatment Plant Operation

14    And Maintenance Agreement (the "Agreement") on June 1, 2021, and in that in the Agreement

15    SCWD agreed to:

16        51.    In Recital D – SCWD agrees that the Parties to the agreement have determined that

17    SCWD maintains the appropriate staffing, expertise, equipment, and professional licensing to

18    operate the Industrial Wastewater Treatment Plant ("IWTP") facilities as described in the lease

19    between NJFC and the City of Hollister.

20        52.    In Paragraph 1.6 - SCWD agrees that the services provided under the agreement are

21    of a professional nature and shall be performed in accordance with good and accepted industry

22    practices.

23        53.    In Paragraph 4.1(a) – SCWD agrees to staff the IWTP facilities with personnel who

24    have appropriate licensing and certification requirements of the State of California and are qualified

25    in technical, laboratory and administrative/management issues to satisfy regulatory requirements.

26        54.    In Paragraph 4.2(j) – SCWD agrees it is the certified operator of the IWTP facilities

27    and shall prepare and sign all operating and reporting documents and permit renewals pertaining to

28    the facilities as required by the California Department of Public Health, Monterey Bay Air Pollution

Control, Regional Water Quality Control Board, and San Benito County Environmental Health Services.

55.     In Paragraph 9.1 – SCWD agrees to indemnify, defend, and hold harmless NJFC, its officers, agents, and employees, from and against any and all claims, liabilities, and losses whatsoever (including damages to property and injuries to or death of persons, court costs, and reasonable attorneys' fees) occurring or resulting to any and all persons, firms or corporations furnishing or supplying work, services, materials, or supplies in connection with the performance of the agreement, and from any and all claims, liabilities, and losses occurring or resulting to any person, firm, or corporation for damage, injury, or death arising out of or connected with the indemnifying Sunnyslope's performance of the agreement, unless such claims, liabilities, or losses arise out of the sole negligence or willful misconduct of NJFC.

56.     In Paragraph 9.2 – SCWD agrees that where such loss, cost or expense is caused, or claimed or alleged to be caused, by the negligence or willful misconduct of both Parties, or their owners, officers, directors, employees, or agents or by a breach of any obligation of this agreement by both Parties, each Party shall defend, indemnify, and hold harmless the other Party in proportion to their proportional fault as determined by mutual agreement or by arbitration or judicial decree.

57.     In Paragraph 9.3 – SCWD is liable for those fines or civil penalties imposed by a regulatory or enforcement agency for violations of treated water quality requirements that are a result of SCWD's sole negligence on or after the effective date of the agreement.

58.     In Paragraph 9.4 – SCWD agrees to maintain levels of insurance identified in the agreement and to name NJFC as a named insured on SCWD's insurance policy.

59.     Section 12.2 – SCWD agrees that its status under the agreement is that of an independent contractor and not an employee of NJFC.

60.     Appendix C – SCWD is required to procure and maintain insurance for the duration of the agreement insuring against claims for injuries to persons or damages to property arising from the operation of the IWTP and the facilities or performance its responsibilities under the agreement. The insurance coverage is to include Commercial General Liability Insurance covering claims of bodily injury, personal injury and property damage arising out of SCWD's operation,

1    assumed liabilities or use of the leased premises, including the obligations of the lease between

2    NJFC and the City of Hollister.  The limits of insurance are: $1 million per occurrence/$2 million

3    annual aggregate; $2 million per occurrence and aggregate for professional liability; $2 million for

4    excess liability.

5        61.    Plaintiffs' complaint alleges damages in excess of $5 million and NJFC asserts that

6    to the extent there is any negligence related to this matter it is based upon the actions/inactions and

7    operations performed by SCWD.  Further, the nuisance violations, if believed, were the result of

8    the actions or inactions of SCWD in operating the water treatment facility.  Further still, as set forth

9    in Paragraphs graphs 74 to 85 below, SCWD's liability would be based upon its causing or

10   contributing to a public nuisance pursuant to California Civil Code Section 3479 and 3480 or private

11   nuisance pursuant to California Civil Code Section 3479.

12       62.    SCWD has agreed to indemnify, defend, and hold harmless NJFC, its officers,

13   agents, and employees, from and against any and all claims, liabilities, and losses whatsoever

14   (including damages to property and injuries to or death of persons, court costs, and reasonable

15   attorneys' fees, occurring or resulting to any and all persons, firms or corporations furnishing or

16   supplying work, services, materials, or supplies in connection with the performance of the

17   agreement, with NJFC and from any and all claims, liabilities, and losses occurring or resulting to

18   any person, firm, or corporation for damage, injury, or death arising out of or connected with the

19   indemnifying SCWD's performance of the agreement, unless such claims, liabilities, or losses arise

20   out of the sole negligence or willful misconduct of NJFC.

21       63.    On February 5, 2025, NJFC served a notice of governmental claim upon SCWD

22   advising SCWD of the information contained in paragraphs 50 to 62 herein and requesting SCWD

23   defend, indemnify and hold NJFC harmless in this matter.  After 45 days, SCWD failed to respond

24   and, by operation of law, rejected NJFC's claim.  As such SCWD has denied said claim.

25       64.    SCWD materially breached the Agreement by the following actions or failures to

26   act:

27        a.    Failing to maintain the appropriate staffing, expertise, equipment, and

28        professional licensing to operate the Industrial Wastewater Treatment Plant

("IWTP") facilities as described in the lease between NJFC and the City of Hollister.

b.    Failing to ensure that the services provided under the Agreement were of a professional nature and performed in accordance with good and accepted industry practices.

c.    Failing to staff the IWTP facilities with personnel who have appropriate licensing and certification requirements of the State of California and are qualified in technical, laboratory and administrative/management issues to satisfy regulatory requirements.

d.    Failing to defend, indemnify, and hold harmless, NJFC.

e.    Failing to procure adequate insurance for NJFC as required in its agreement with NJFC.

65.    As a result of SCWD's multiple material breaches of the Agreement with NJFC, NJFC has sustained and will sustain damages according to proof at trial.  The damages sustained as a result of SCWD's breach  include, but are not limited to, the following: (A) the amounts if any required to be paid to Plaintiffs (B) the amounts required to defend against Plaintiffs' claims; (C) the amounts to pay whatever amount would be required to satisfy the Plaintiffs  damages in this matter, if any, and (D) all other amounts owed, paid or spent by NJFC as a result of the claims made by Plaintiffs.

66.    Pursuant to the terms of the Agreement, NJFC is entitled to an award of attorney's fees incurred in connection with this litigation.

### SECOND CAUSE OF ACTION

### (Negligence - Against Third-Party Defendant SCWD)

67.    NJFC realleges and incorporates by reference paragraphs 1 through 48, and 50 through 66, as if fully set forth herein.

68.    By entering into the Agreement with NJFC, SCWD assumed a duty to NJFC and to the public at large, to fulfill SCWD's operations at the IWTP as set forth in the Agreement.

69.    SCWD breached its duty by failing to  perform its duties as set forth in paragraphs 64(a) through, and including, 64(e) above.

70.     As a result of SCWD's multiple breach of its duty, NJFC received several Notices of Violation (NOV) from the Monterey Bay Air Resources District ("MBARD") relating to its operation of the Facility, resultant odors, and the finding of public nuisance. These NOVs are directly responsible for, and are the proximate cause of, the matters complained of by Plaintiffs.

71.     SCWD's multiple breaches of its duties are a substantial factor in causing the matters complained of by Plaintiffs.

72.     NJFC has also incurred and will continue to incur necessary and reasonable attorney's fees and other legal costs in prosecuting this Third-Party Complaint.

73.     If NJFC sustains any losses or damages alleged in Plaintiffs' Complaint, such losses or damages are caused by the breach of duty amounting to negligence, active negligence, and failure to perform a duty by SCWD for which SCWD owes damages to NJFC.

### THIRD CAUSE OF ACTION

### (Public Nuisance - Against Third-Party Defendant SCWD)

74.     NJFC realleges and incorporates by reference paragraphs 1 through 48, 50 through 66, and 68 through 73, as if fully set forth herein.

75.     California Civil Code Section 3479 sets forth the statutory framework for establishing the existence of a nuisance in California.

> "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance." (Cal. Civ. Code, § 3479.)

NJFC alleges that the application of 3479 should apply as: Plaintiffs allege that by causing noxious odors produced and controlled by Defendant to physically invade Plaintiffs' land and property, *Defendant intentionally, recklessly, and/or negligently created a nuisance which substantially and unreasonably interfered with Plaintiffs' comfortable use and enjoyment of their property and caused the values of said property to diminish.* (See Complaint ¶ 68, no emphasis added in the original.)

76.     Pursuant to California Civil Code Section 3480, Plaintiff's allegations of a public

nuisance support a similar claim against SCWD by NJFC. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Cal. Civ. Code, ¶ 3480.) By breaching its duty to operate the IWTP as promised, SCWD created the conditions for which the NOVs from MBARD were issued.

77.    The conditions as described in the NOVs allegedly affected a substantial number of people at the same time. Further, that an ordinary person would be reasonably annoyed or disturbed by the conditions. The seriousness of the harm would outweigh the social utility of SCWD's conduct. Also, that Plaintiffs did not consent to SCWD's conduct. Plaintiffs allege that they suffered harm that was different from the type of harm suffered by the general public; that the harm substantially and unreasonably interfered with the free use of the Plaintiffs' property and the comfortable enjoyment of their property. SCWD's conduct was a substantial factor in bringing about the harm alleged by Plaintiffs.

78.    NJFC has also incurred and will continue to incur necessary and reasonable attorney's fees and other legal costs in prosecuting this Third-Party Complaint.

79.    If NJFC sustains any losses or damages alleged in Plaintiffs' Complaint, such losses or damages are caused by the breach of duty amounting to public nuisance for which SCWD owes damages to NJFC.

## FOURTH CAUSE OF ACTION

### (Private Nuisance - Against Third-Party Defendant SCWD)

80.    NJFC realleges and incorporates by reference paragraphs 1 through 48, 50 through 66, 68 through 73, and 75 through 79, as if fully set forth herein California Civil Code Section 3481 provides that, "Every nuisance not included governmental in the definition of the last section is private." (Cal. Civ. Code, § 3481.) To the extent that SCWD's conduct as set forth in the paragraphs above, fail to meet the evidentiary requirements for public nuisance under Civil Code Sections 3479 and 3480, NJFC alleges that such conduct defaults to private nuisance as provided in California Civil Code Section 3481. NJFC has also incurred and will continue to incur necessary and reasonable attorney's fees and other legal costs in prosecuting this

1 | Third-Party Complaint. If NJFC sustains any losses or damages alleged in Plaintiffs' Complaint,

2 | such losses or damages are caused by the breach of duty amounting to public nuisance for which

3 | SCWD owes damages to NJFC.

**FIFTH CAUSE OF ACTION**

**(Express Indemnity – Against Third-Party Defendant SCWD)**

81.     NJFC realleges and incorporates by reference paragraphs 1 through 48, 50 through 66, 68 through 73, 75 through 79, and 81 through 82, as if fully set forth herein.

82.     In defending and/or compromising the claims in Plaintiffs' Complaint, NJFC will necessarily and reasonably incur and pay attorney's fees and other legal costs in an amount according to proof at trial.

83.     NJFC has also incurred and will continue to incur necessary and reasonable attorney's fees and other legal costs in prosecuting this Third-Party Complaint. SCWD is obligated pursuant to its contractual agreement with NJFC and its terms, as set forth in Attachment A, to defend, hold-harmless and indemnify NJFC for all the damages, and legal fees and costs incurred by NJFC to defend Plaintiffs' Complaint and to prosecute this Third-Party Complaint.

84.     If NJFC sustains any losses or damages alleged in Plaintiffs' Complaint, such losses or damages are caused by the breach of duty amounting to negligence, active negligence, and failure to perform a contractual duty, expressed or implied, by SCWD.

85.     The damages Plaintiffs seek from NJFC shall be shifted to SCWD because these damages were imposed as a result of SCWD's legal obligations owed to NJFC and to Plaintiffs.

86.     If NJFC is found in some manner responsible to Plaintiffs or to anyone else as a result of the claims alleged in Plaintiffs' Complaint, NJFC's liability will be based solely upon a derivative form of liability not resulting from NJFC's conduct, but rather from SCWD's negligence as set forth in this Third-Party Complaint; therefore, NJFC is entitled to complete indemnity from SCWD.

/ / /

/ / /

/ / /

**PRAYER**

WHEREFORE, NJFC prays for judgment against SCWD as follows:

**First Cause of Action for Breach of Written Contract**

1.     For contract damages according to proof;

2.     For consequential damages according to proof;

3.     For NJFC's legal costs including costs of suit and attorneys' fees;

4.     For such other and further relief as the Court may deem proper.

**Second Cause of Action for Negligence**

1.     For special damages according to proof;

2.     For general damages according to proof;

3.     For NJFC's legal costs including costs of suit and attorneys' fees;

4.     For such other and further relief as the Court may deem proper.

**Third Cause of Action for Public Nuisance**

1.     For compensatory damages for the harm caused by SCWD;

2.     For any harm to Plaintiffs' property;

3.     For loss of use of Plaintiffs' property;

4.     Compensation for mental anguish, emotional distress, physical discomfort, or irritation caused by the nuisance;

5.     For economic damages caused by the nuisance;

6.     For NJFC's legal costs including costs of suit and attorneys' fees;

7.     For such other and further relief as the Court may deem proper.

**Fourth Cause of Action for Private Nuisance**

1.     For compensatory damages for the harm caused by SCWD;

2.     For any harm to Plaintiffs' property;

3.     For loss of use of Plaintiffs' property;

4.     Compensation for mental anguish, emotional distress, physical discomfort, or irritation caused by the nuisance;

5.     For economic damages caused by the nuisance;

1    6.    For NJFC's legal costs including costs of suit and attorneys' fees;

2    7.    For such other and further relief as the Court may deem proper.

3    **Fifth Cause of Action for Express Indemnity**

4    1.    For special damages according to proof;

5    2.    For general damages according to proof;

6    3.    For such other and further relief as the Court may deem proper.

7

8    Dated:    October 6, 2025                COLEMAN & HOROWITT, LLP

9

10                                By:

11                                    STEVEN C. CLARK
                                     DAVID J. WEILAND
12                                    Attorneys for Defendant/Cross-
                                     Complainant, THE NEIL JONES FOOD
13                                    COMPANY, dba SAN BENITO FOODS

Attachment A

## INDUSTRIAL WASTEWATER TREATMENT PLANT OPERATIONS AND MAINTENANCE AGREEMENT BETWEEN

### SUNNYSLOPE COUNTY WATER DISTRICT AND THE NEIL JONES FOOD COMPANY

This OPERATIONS AND MAINTENANCE AGREEMENT ("O&M AGREEMENT") is made and entered into effective ___June 1, 2021___ by and between THE NEIL JONES FOOD COMPANY dba SAN BENITO FOODS (SBF) and SUNNYSLOPE COUNTY WATER DISTRICT (SSCWD or OPERATOR), hereinafter collectively called the "Parties".

### FACTS:

A. On March 29th, 2021, SBF entered into the "Industrial Wastewater Treatment Plant Lease Agreement" (IWTP-LA) with the City of Hollister (CITY), to lease from the CITY Treatment Pond #1 for the purpose of treating industrial wastewater; and

B. The IWTP-LA between the CITY and SBF stipulates that SBF will be operationally and fiscally responsible for the operations and maintenance of the Industrial Wastewater Treatment Facilities (Facilities), as described in Section 2, "Description of Facilities" of the IWTP-LA; and

C. The IWTP-LA requires that SBF shall be responsible to maintain and comply with current Waste Discharge Requirements (WDR) as stipulated by the governing Regional Water Quality Control Board (RWQCB); and

D. The Parties have determined that SSCWD maintains the appropriate staffing, expertise, equipment, and professional licensing to operate the Facilities as required by the RWQCB; and

E. The Parties desire to enter into this O&M Agreement to establish the terms and conditions for SSCWD's operation of the Facilities.

NOW THEREFORE, in consideration of the terms and conditions contained herein and the covenants entered into herein, the Parties hereby agree as follows:

## ARTICLE 1.  GENERAL

1.1 Definitions of words and phrases used in this O&M Agreement are set forth in Appendix A, which is attached hereto and incorporated by reference.

1.2 This O&M Agreement shall be governed by and interpreted in accordance with the laws of the State of California.

1.3 All notices shall be in writing and transmitted to the Parties at such addresses as each Party may designate by written notice to each other. All notices shall be deemed effectively given when delivered, either by personal service, confirmed email receipt, or by certified U.S. mail, return receipt requested.

1.4 This O&M Agreement, including Appendices A through C, is the entire agreement between the Parties. This O&M Agreement may be modified only by written agreement signed by both Parties. Wherever used, the terms SBF and OPERATOR shall include the officers, directors, elected or appointed officials, employees, volunteers, and agents of each.

1.5 If any term, provision, covenant, or condition of this O&M Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect, and shall in no way be affected, impaired or invalidated.

1.6 It is understood that the services provided under this O&M Agreement are of a professional nature and shall be performed in accordance with good and accepted industry practices.

1.7 Prior to the commencement of work under this O&M Agreement, each Party shall designate in writing, an employee(s) or other representative(s) of the designating Party who shall have full authority to negotiate changes to the scope of the O&M Agreement, costs and fees. All such changes will require approval by the authorized representatives of SBF and the OPERATOR's Board of Directors.

1.8 OPERATOR shall not assign or transfer this O&M Agreement or any part hereof or any rights hereunder without the prior written approval of SBF, which shall not be unreasonably withheld. Subject to the preceding sentence, this O&M Agreement and all terms and conditions contained herein shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto.


## ARTICLE 2.  COORDINATION WITH IWTP-LA

2.1 Upon execution of this O&M Agreement, and upon satisfaction of all the conditions precedent set forth in Article 2.4, this O&M Agreement shall become effective.

2.2 The initial Term of this O&M Agreement shall be for a period beginning from the effective date and shall terminate at midnight on December 31, 2026 unless terminated

in accordance with the Term, Termination and Default provisions set forth in Article 10 of this O&M Agreement.

2.3 The Term(s) of this O&M Agreement shall run congruent with the terms of the IWTP-LA. Unless otherwise terminated, the O&M Agreement shall renew upon renewal of the IWTP-LA, and shall terminate upon termination of the IWTP-LA allowing that notice has been provided to OPERATOR per requirements of Article 10. This O&M Agreement shall expire at the end of the exercised options defined in the Extensions of the Lease Term as defined in the IWPT-LA and shall be renewed by a new agreement between the Parties.

2.4 The following are acknowledged by both Parties to be conditions precedent to any of the OPERATOR's Responsibilities, Article 4, under this O&M Agreement:

(a) SBF shall obtain a Waste Discharge Number and RWQCB Permit (Permit) from the State of California for industrial wastewater disposal for Treatment Pond #1;

(b) SBF shall complete Treatment Pond #1 improvements necessary to comply with the Permit conditions to the satisfaction of the SSCWD General Manager; and

(c) SBF shall provide a floating workstation for pond equipment inspection and maintenance to the satisfaction of the SSCWD General Manager.

## ARTICLE 3. OPERATIONS AND MAINTENANCE

3.1 OPERATOR shall operate and manage the Facilities on a 24-hour per day, 7 day per week basis for operations and management (O&M) and asset management, including grounds maintenance as set forth in the IWTP-LA, maintenance and operation of on-site pumps, and instrumentation in accordance with generally accepted industry practices, within the Facilities design capacity and capabilities, in full compliance with all applicable Federal, State and local laws, regulations, policies, rules and permits. It shall be understood that as designed, the Facilities shall provide for remote monitoring, and therefore shall not require OPERATOR to have personnel physically on site on a 24/7 basis.

3.2 OPERATOR shall provide all preventive, predictive and corrective maintenance and repairs on the grounds, facilities equipment, and fencing unless such maintenance and repair arises out of the negligence or willful misconduct of SBF. OPERATOR shall provide an annual list of all preventive, predictive, and corrective maintenance and repairs anticipated to be provided for the upcoming fiscal year (Annual Maintenance Schedule). The Annual Maintenance Schedule shall be provided to SBF by April 1 of the preceding fiscal year. The Annual Maintenance Schedule may be modified throughout

the course of the year, by mutual agreement of the Parties, upon OPERATOR reviewing and documenting system maintenance needs.

## ARTICLE 4.  RESPONSIBILITIES

**4.1** Personnel:

(a) OPERATOR shall staff the Facilities with personnel who have appropriate licensing and certification requirements of the State of California and are qualified in technical, laboratory and administrative/management issues to satisfy regulatory requirements and provide O&M services under the scope of this O&M Agreement.

(b) OPERATOR shall submit a staffing and organizational structure to SBF on an annual basis.

(c) OPERATOR shall conduct a background check on all new employees to verify that all employees are qualified to perform their assigned tasks and meet any State or Federal employment and security laws or regulations applicable to working in or with wastewater treatment facilities.

(d) OPERATOR shall appoint a full-time Wastewater Treatment Superintendent who will be the primary agent in all matters pertaining to permit compliance.

(e) OPERATOR shall provide for a licensed emergency on-call operator at all times and contact information for afterhours response to all emergency concerns pertaining to the services under this O&M Agreement.

**4.2** Operations and Maintenance:

(a) OPERATOR shall provide ongoing training and education for appropriate personnel in all necessary areas of modern wastewater treatment process control, operations, maintenance, safety, laboratory quality control/quality assurance, and supervisory skills. All training shall be consistent with maintaining licensing certification of all Facility operators. The training shall be documented and maintained by OPERATOR and available to SBF upon request.

(b) OPERATOR shall manage, operate, and maintain the Facilities so that treated water complies with the conditions of the most current operational Permit, to the extend allowable by the design capacity and capabilities of the Facilities.

(c) OPERATOR shall prepare an operations and maintenance manual conforming to City requirements 45 days in advance of commencing operation as required by the IWTP-LA, which deadline may be modified with City's consent.

(d) OPERATOR shall prepare a series of standard operating procedures ("SOPs") for each unit process at the Facilities. The SOPs shall provide appropriate step-by-step instructions on the operation of each unit process and associated equipment and controls. The SOPs shall include, as needed, startup procedures and shutdown

procedures, adjustment of variable functions and settings, interface with other Facilities systems, troubleshooting, and remedying unit process upsets, process and regulatory sampling and analysis, routine monitoring checklists and reporting forms.

(e) OPERATOR shall maintain Facilities in a clean, neat, and orderly condition. OPERATOR shall keep equipment, tools, materials, and supplies properly and safely stored.

(f) OPERATOR shall be responsible for maintaining all manufacturers' warranties on new equipment purchased by SBF and assist SBF in enforcing existing equipment warranties and guarantees.

(g) OPERATOR shall provide laboratory testing by OPERATOR staff or contract services required for compliance with all Federal, State, and local laws, regulations and permits and provide a Quality Control/Quality Assurance program for such sampling, testing and analyses satisfactory to SBF. OPERATOR shall estimate laboratory testing services costs to be included in OPERATOR's annual budget. At the end of each fiscal year, actual costs shall be trued up. Any overage or underage shall be applied to OPERATOR's next year's budget for services.

(h) In any emergency, OPERATOR may act without written amendment or change order, at the OPERATOR's sole discretion, to prevent threatened damage, injury, or loss to the Facilities or Permit compliance. An emergency shall include, but not be limited to, damages to property caused by high voltage surges, vehicle accidents impacting operations, and any other incident deemed to cause a safety condition to motorists, pedestrians, fire department or customer, or that significantly impacts operations. Provided that the emergency is not the result of OPERATOR's sole negligence or willful misconduct in performing its obligations under this O&M Agreement, OPERATOR shall be compensated by SBF for any such emergency work notwithstanding the lack of a written amendment or change order. If the emergency costs exceed $5,000, the emergency costs shall not be due and payable until 30 days after OPERATOR requests reimbursement. OPERATOR shall provide such documents as SBF may reasonably request as evidence of the emergency situation and the emergency services performed.

(i) OPERATOR shall submit a monthly operation and maintenance report to SBF by the 10th of the following month. The information and form of the report shall be mutually agreed upon by the Parties, and, at a minimum, shall include a report on those items identified as responsibilities required of SBF in Section 4 of the IWTP-LA.

(j) As certified OPERATOR of the Facilities, OPERATOR shall prepare and sign all operating and reporting documents and permit renewals pertaining to the operation of the Facilities as authorized and/or required by the following State and local governments: California Department of Public Health; Monterey Bay Air Pollution Control; RWQCB; and San Benito County Environmental Health Services. OPERATOR shall provide SBF with copies of all reports and documents five (5) days prior to

submitting the reports or documents to an outside agency and shall confirm submittal within ten (10) days of submitting those same reports to any outside agency.

4.3   Other Requirements:

(a) OPERATOR shall maintain a professional, responsible, and responsive working relationship with SBF staff, advisors, consultants, regulatory agencies and other SBF stakeholders.

(b) OPERATOR shall refer inquiries from the news media regarding operation and maintenance of the Facilities or other activities of SBF to the designated SBF Manager.

(c) OPERATOR shall meet at least quarterly with SBF to review and discuss O&M activities and plans.

(d) OPERATOR shall allow SBF designated personnel access to the Facilities on a twenty-four (24) hours per day basis and shall provide all necessary safety equipment and safe access for those areas to be inspected, toured, or evaluated. SBF shall ensure OPERATOR shall have unrestricted access to the Facilities grounds as set forth in the IWTP-LA. SBF shall not make any modifications, or changes to any Facilities within the control of the OPERATOR unless accompanied by and in the presence of an authorized OPERATOR representative.

(e) OPERATOR shall develop and maintain all required Hazardous Materials, and OSHA plans, procedures and programs as specified by Federal, State, or local laws, regulations, or permits and such additional plans, procedures and programs as may be necessary to detail contingencies to address conditions that would threaten the provision of the wastewater utility services consistent with Federal, State, and local laws, regulations and permits.

(f) As may be required by policy, SBF shall provide at their expense, for an annual audit of the OPERATOR's workplace health, safety, and environmental compliance programs.

## ARTICLE 5.  CAPITAL PROJECTS

5.1 SBF shall be responsible to implement all capital improvements to the Facilities, including those related to regulatory requirements, renewal, and replacement. Capital projects are major improvements exclusive of the annual maintenance projects defined in Article 3.2 herein as part of the Annual Maintenance Schedule.

5.2 SBF shall be responsible for financing, designing, and managing the construction of any such capital improvements. SBF will work with OPERATOR to develop an implementation plan and schedule to minimize disruption or temporary shutdown of the Facilities.

5.3 SBF shall make the replacement and rehabilitation of the Facilities electrical distribution system and Motor Control Cabinets (MCC) for all aeration motors (Electrical System) of

primary importance with dates for completion to be identified in the Capital Improvement plan.

## ARTICLE 6.  PERMIT AND OPERATIONAL COMPLIANCE

**6.1** OPERATOR Obligations:

(a) Within the design capacity and capabilities of the Facilities described in Exhibits 1 and 2 of IWTP-LA, OPERATOR shall manage, operate, and maintain the Facilities as assigned by SBF.

(b) OPERATOR shall ensure compliance with applicable Federal and State water quality regulations and standards to the extent allowable by the design capability of the Facilities.

(c) OPERATOR shall communicate to SBF in a timely manner the accurate operational costs, operating constraints and any Permit non-compliance issues.

(d) OPERATOR shall coordinate and maintain an open and productive relationship with the CITY.

(e) OPERATOR shall understand and direct the Facilities maintenance as described in Section 4 – Roles and Responsibilities of the IWTP-LA.

(f) OPERATOR shall report annually to SBF all operational actions taken to achieve compliance within the approved operational Permit.

**6.2** SBF Obligations:

(a) SBF shall be responsible for all financial responsibilities, including fees, costs, fines or penalties, associated with Permit compliance, or non-compliance, to the RWQCB and to all other state and local permitting agencies.

(b) SBF recognizes that current background wastewater influent may create situations where discharged effluent may exceed permitted values. SBF shall be responsible for all capital improvements required to bring these values into compliance as required by the RWQCB.

(c) Process chemicals utilized at the Facilities shall be approved in writing by SBF. Upon approval, SBF shall pay the monthly cost associated with the addition of such chemicals.

(d) SBF shall provide for the OPERATOR's exclusive use of all Facilities Equipment as referenced in Appendix B, attached hereto and incorporated by reference.

(e) SBF shall pay for all direct electrical costs of operation of the Facilities.

## ARTICLE 7.  COMPENSATION

7.1 On or before March 1 of each year, OPERATOR shall submit to SBF a budget for the fiscal year commencing on the next May 1. The budget shall specify the amount of operation and maintenance expenses required for the ensuing fiscal year and set forth in reasonable detail the fixed and variable cost components of such O&M expenses.

7.2 SBF shall review the budget and shall, within 60 days after receipt thereof, submit its comments to OPERATOR. The Parties shall agree upon and approve a budget not later than April 30. If such agreement is not reached, the parties will abide by the Dispute Resolution procedures set forth in Article 10. During such time OPERATOR shall continue to operate the Facilities for a minimum of 180 days.

## ARTICLE 8.  PAYMENT OF COMPENSATION

8.1 One-twelfth (1/12) of the annual fee for OPERATOR's personnel costs for the current year shall be paid by SBF to OPERATOR on the first of the month for each month that services are provided.

8.2 SBF shall pay to OPERATOR the annual O&M Costs, including both fixed and variable costs of the annual operation, on a monthly basis. The allocation of such fixed and variable costs shall be adjusted within ninety (90) days of the close of each fiscal year to reflect the actual fixed and variable costs incurred. SBF shall pay or receive a refund or credit for any adjustments to costs charged to SBF within thirty (30) days of finalizing the adjustment.

## ARTICLE 9.  INDEMNITY, LIABILITY, AND INSURANCE

9.1 Each Party shall indemnify, defend, and hold harmless the other Party, its officers, agents, and employees, from and against any and all claims, liabilities, and losses whatsoever (including damages to property and injuries to or death of persons, court costs, and reasonable attorneys' fees) occurring or resulting to any and all persons, firms or corporations furnishing or supplying work, services, materials, or supplies in connection with the performance of this O&M Agreement, and from any and all claims, liabilities, and losses occurring or resulting to any person, firm, or corporation for damage, injury, or death arising out of or connected with the indemnifying Party's performance of this O&M Agreement, unless such claims, liabilities, or losses arise out of the sole negligence or willful misconduct of the other Party.

9.2 Where such loss, cost or expense is caused, or claimed or alleged to be caused, by the negligence or willful misconduct of both Parties, or their owners, officers, directors,

employees, or agents or by a breach of any obligation of this agreement by both Parties, each Party shall defend, indemnify, and hold harmless the other Party in proportion to their proportional fault as determined by mutual agreement or by arbitration or judicial decree.

9.3 OPERATOR shall be liable for those fines or civil penalties imposed by a regulatory or enforcement agency for violations of treated water quality requirements that are a result of the OPERATOR's sole negligence on or after the effective date of this O&M Agreement.

9.4 Each Party shall obtain and maintain insurance coverage of a type and in the amounts described in Appendix C, attached hereto and incorporated by reference, and each party shall be a named insured on the other Party's policy. Each Party assumes the risk of loss or damage to its respective property, from any cause, including the actual or alleged negligence or strict liability of the other Party, and shall maintain broad form property insurance in order to protect both parties against any such loss. Each Party shall provide the other Party with satisfactory proof of insurance, and notification of any changes or modifications to coverage.

## ARTICLE 10. TERM, TERMINATION, AND DEFAULT

10.1  The initial Term of this O&M Agreement shall be five years commencing on the date of final signing of this O&M Agreement. Thereafter, this O&M Agreement may be renewed at SBF's discretion for two consecutive Terms of five years each. Each Party shall give the other Party notice of whether they desire to extend the O&M Agreement for a successive Term, not less than one hundred eighty (180) days prior to expiration of agreement or any extension.

10.2  Either Party may terminate this O&M Agreement at any time and without cause by providing the other Party with written notice of termination at least 180 days in advance.

10.3 Upon termination of this O&M Agreement and all renewals and extensions of it, OPERATOR shall return the Facilities to SBF in the same condition as it was upon the effective date of this O&M Agreement, ordinary wear and tear excepted. Equipment and other personal property purchased by OPERATOR for use in the operation or maintenance of the Facilities shall remain the property of OPERATOR upon termination of this O&M Agreement, unless the property was directly paid for by SBF, or SBF specifically reimbursed the OPERATOR for the cost incurred to purchase the property, or this O&M Agreement provides otherwise. If it is determined that the OPERATOR has

not maintained the Facilities in accordance with the Annual Maintenance Schedule submitted in the years preceding the termination, the portion of the reduction in value of the item attributed to the non-adherence to the Annual Maintenance Schedule shall be the OPERATOR's sole responsibility.

## ARTICLE 11. DISPUTE RESOLUTION

11.1    If a dispute arises between the Parties regarding breach of this O&M Agreement or interpretation of any term of this O&M Agreement, the Parties shall first make good faith efforts to negotiate the dispute followed by mediation if necessary. During such time OPERATOR shall continue to operate the Facilities under the terms of this O&M Agreement.

(a)    Step One: The General Managers or other persons designated by the Parties will negotiate on behalf of the entities they represent. The nature of the dispute shall be reduced to writing and shall be presented to each General Manager or representative who shall then meet and attempt to resolve the issue. If the dispute is resolved at this step, there shall be a written determination of such resolution, signed by each Party's General Manager or representative and ratified by each Party, which shall be binding upon the Parties.

(b)    Step Two: If the dispute cannot be resolved within ten (10) days of the writing at Step One, the Parties shall submit the matter to non-binding mediation. The dispute shall be heard by a mediator selected by mutual agreement of the Parties. If the parties are unable to agree on a mediator, each Party shall select a mediator and the two mediators selected shall appoint the third mediator by mutual agreement. Costs of mediation shall be borne equally by the Parties. If the issue is resolved at this step, a written determination of such resolution shall be signed by each General Manager or representative and approved by the respective Parties.

11.2    Other disputes not resolved under Step 2 above shall be resolved by proceedings in the Superior Court of the County of San Benito, State of California. If arbitration, suit, or action is commenced, the prevailing Party in any such action shall be entitled to its reasonable attorney fees and court costs as may be awarded by the arbitration panel, trial court or upon appeal.

## ARTICLE 12. MISCELLANEOUS PROVISIONS

12.1    <u>MAINTENANCE OF RECORDS</u>. OPERATOR shall prepare, maintain and preserve all reports and records that may be required by federal, State, and local rules and

regulations relating to services performed under this Agreement. OPERATOR shall retain all such records for at least five (5) years from the date of final payment under this O&M Agreement, or until any litigation relating to this O&M Agreement is concluded, whichever is later. SBF shall have the right, at any time during regular working hours and on reasonable advance notice, to examine, monitor and audit all work performed and all records, documents, conditions, activities and procedures of OPERATOR.

12.2  <u>INDEPENDENT CONTRACTOR</u>. In its performance under this O&M Agreement, OPERATOR is at all times acting and performing as an independent contractor and not an employee of SBF.

12.3  <u>CONFLICT OF INTEREST</u>. OPERATOR warrants that it presently has no interest and shall not acquire any interest during the term of this O&M Agreement which would directly or indirectly conflict in any manner or to any degree with its full and complete performance of all services under this O&M Agreement.

12.4  <u>INTERPRETATION OF CONFLICTING PROVISIONS</u>. In the event of any conflict or inconsistency between the provisions of this O&M Agreement and the Provisions of any exhibit or other attachment to this Agreement, the provisions of this O&M Agreement shall prevail and control.

12.5  <u>HEADINGS</u>. Headings are for convenience only and shall not be used to interpret the terms of this O&M Agreement.

12.6  <u>WAIVER</u>. Any waiver of any term or condition hereof must be in writing. No such waiver shall be construed as a waiver of any other term or condition herein.

12.7  <u>EXECUTION OF AGREEMENT</u>. Any individual executing this O&M Agreement on behalf of an entity represents and warrants that they have the requisite authority to enter into this O&M Agreement on behalf of such entity and to bind the entity to the terms and conditions hereof.

12.8  <u>COUNTERPARTS.</u> This O&M Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same O&M Agreement.

IN WITNESS WHEREOF, OPERATOR and SBF executed this O&M Agreement as of the date set forth next to their respective signatures.

Dated: 5-28-21

**SUNNYSLOPE COUNTY WATER DISTRICT**

By _____
Jerry Buzzetta, President of the Board

By _____
Drew A. Lander, General Manager

Dated: 5-19-21

**THE NEIL JONES FOOD COMPANY dba SAN BENITO FOODS**

By _____
Don Carr, Operations Environmental Health and Safety Manager

# Appendix A

## Definitions

**Effluent** – Effluent is wastewater from Pond 1 that has been treated to meet effluent standards identified in the WDR and being disposed of via the percolation basins. Effluent is also stormwater that is being discharged from Pond 2 to the percolation basins.

**Facilities** – Facilities shall include those items under the care and maintenance of SSCWD. Definitions are as described in the IWTP-LA and identified as the following:

- Combination Sewer/Storm Drain Collection System
- Flow Meter
- Headworks
- South Street Diversion Structure (Proposed)
- Pond 1 Wastewater Treatment Pond
- Pond 1 Effluent Discharge Collection System
- Effluent Discharge Collection System
- Percolation Basins
- Roads and Other site Areas

**Industrial Wastewater** – Wastewater generated by SBF at the approved canning Facilities through the seasonal tomato food processing system. Industrial wastewater does not include any domestic waste or other processing system. Industrial wastewater does not include whole or non-processed by-products of the canning process. Industrial wastewater does include wash down water from the cannery that enters the storm drain collection system.

**Operator** – Sunnyslope County Water District

**SBF** – The Neil Jones Food Company dba San Benito Foods

**Recycled Water** – Recycled Water is treated effluent from the City of Hollister's (City) Regional Domestic Wastewater Treatment Plant that produces recycled water or other City pre-approved recycled water source.

**Regional Water Quality Control Board (RWQCB)** – State regulatory agency governing wastewater discharge requirements.

**Water** – Water is potable water either obtained from SBF's on-site well or from a connection to the City's water distribution system.

**Wastewater Discharge Requirements (WDR)** – Effluent permit limitations set forth by the RWQCB.

## Appendix B

Equipment List:

1) Aeration Maintenance Barge - Motorized floating platform, with total buoyancy capacity of no less than 6000lbs and fitted with a lifting apparatus to support a 4000lb load.

No other equipment is identified at this time. Additional equipment may be included as needed by amendment.

# Appendix C

## Insurance Provisions:

OPERATOR and SBF shall procure and maintain insurance for the duration of the O&M Agreement against claims for injuries to persons or damages to property which may arise from the operation of the IWTP and the Facilities or performance for the responsibilities hereunder, including the following coverages in the following amounts:

(a)    All insurance required by applicable law, including without limitation, workers' compensation and employer's liability insurance with all applicable statutory limits.

(b)    Commercial General Liability Insurance covering the insured against claims of bodily injury, personal injury and property damage arising out of the OPERATOR'S operation, assumed liabilities or use of the Premises, including a Broad Form Comprehensive General Liability endorsement covering the Insuring provisions of the IWTP-LA executed between the CITY and SBF and found in Section 5 of said agreement, for limits of liability not less than:

Required IWTP-LA coverage

12.8.1  *Bodily Injury, Property Damage Liability, and Personal Injury Liability*
*$1,000,000 each occurrence*
*$2,000,000 annual aggregate*

12.8.2  *Worker's Compensation and Employer's Liability Insurance, with a waiver of subrogation endorsement, with minimum limits of $1,000,000 per employee and $1,000,000 per occurrence.*

(c)    Professional liability (E&O) insurance with limits of not less than $2,000,000 per occurrence and aggregate.

(d)    Excess liability of at least $2,000,000

(e)    Automobile liability insurance with not less than $2,000,000 limit covering the use of any owned, non-owned, and hired automobile in the rendering of any services to be provided under this Agreement.

Attachment B

Mike Arias, Esq. (SBN 115385)
Arnold C. Wang, Esq. (SBN 204431)
**ARIAS SANGUINETTI WANG & TEAM LLP**
6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Telephone: (310) 844-9696
Facsimile: (310) 861-0168
mike@aswtlawyers.com
arnold@aswtlawyers.com

Steven D. Liddle, Esq.*
Laura L. Sheets, Esq.*
D. Reed Solt, Esq.*
**LIDDLE SHEETS P.C.**
*Pro Hac Vice* Applications to be submitted
975 E. Jefferson Avenue
Detroit, Michigan 48207
Telephone: (313) 392-0015
Facsimile: (313) 392-0025
sliddle@lsccounsel.com
lsheets@lsccounsel.com
rsolt@lsccounsel.com

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH VALLEJO, VICTOR ESPERICUETA and CHRISTOPHER JONES on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>THE NEIL JONES FOOD COMPANY, d/b/a SAN BENITO FOODS,<br><br>                Defendants. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR:<br><br>1. Public Nuisance;<br>2. Private Nuisance; and<br>3. Negligence<br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

ARIAS SANGUINETTI WANG & TEAM LLP

## INTRODUCTION

1.    Plaintiffs bring this class action against Defendant, The Neil Jones Food Company, ("Defendant") for its release of noxious odors onto Plaintiffs' property.

2.    Defendant owns and operates the San Benito Foods ("the Facility") that releases noxious off-site odors, causing material injury to property through nuisance and negligence.

3.    At its Facility, Defendant operates a cannery where it cans fresh tomatoes. As part of this process, Defendant receives, processes, stores and transports tomatoes and the waste that results from this process (operations).

## PARTIES

4.    At all times relevant hereto, Plaintiff, Joseph Vallejo, has resided at 1020 Harbor Ct., City of Hollister, County of San Benito, California.

5.    At all times relevant hereto, Plaintiff, Victor Espericueta, has resided at 831 Sally St., City of Hollister, County of San Benito, California.

6.    At all times relevant hereto, Plaintiff, Christopher Jones, has resided at 1220 Apricot Lane, City of Hollister, County of San Benito, California.

7.    Defendant, The Neil Jones Food Company, is a Washington Corporation with its principal place of business located in Vancouver, Washington.

8.    Defendant's food processing Facility is located at 711 Sally St., in the City of Hollister, County of San Benito, California.

9.    Defendant, including its predecessors and agents, either constructed or directed the construction of the Facility and exercised control over the Facility, including day-to-day management and operations, at all relevant times hereto.

## JURISDICTION AND VENUE

10.    Plaintiffs are citizens of California.

11.    Defendant is a citizen of Washington, the state where it is incorporated, and Washington, the state where it is headquartered.

CLASS ACTION COMPLAINT

ARIAS SANGUINETTI WANG & TEAM LLP

12. This Court has original jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy greatly exceeds $75,000, exclusive of interests and costs, and there is complete diversity of citizenship between the parties.

13. Separately, and in addition to diversity jurisdiction under 28 U.S.C. § 1332(a)(1), this Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA") pursuant to 28 U.S.C. § 1332(d)(2)(a). CAFA jurisdiction is appropriate because there are 100 or more putative class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and one or more members of the putative class is a citizen of a state different from any defendant.

14. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this District, and because the property that is the subject of this action is situated in this District.

## GENERAL ALLEGATIONS

15. Defendant owns and operates a food processing Facility located at 711 Sally St., in Hollister, California, where it receives, processes and cans fresh tomatoes for the wholesale and retail markets.

16. Defendant's facility is surrounded by residential properties.

17. On frequent, recurrent, and continuing occasions too numerous to list herein, Plaintiffs' property has been and continues to be physically invaded by noxious odors.

18. The noxious odors which entered Plaintiffs' property originated from Defendant's Facility, and/or its operations, resulted from Defendant's intentional and/or negligent acts and/or omissions.

19. The odors caused by the Facility, and/or its operations, have been and continue to be dispersed across all public and private land in the Class Area.

/ / /

/ / /

ARIAS SANGUINETTI WANG & TEAM LLP

*ARIAS SANGUINETTI WANG & TEAM LLP*

### *Defendant's Facility Operations*

20.    Defendant operates a tomato cannery that processes and cans fresh tomatoes at its Facility.  These tomatoes are converted into various tomato-based products.

21.    The canning process produces millions of gallons of organic waste which, if not properly and expediently treated, will release noxious odors.

22.    To treat the waste created by its operations, Defendant leases the use of at least a portion of the City of Hollister's Wastewater Treatment Facility.

23.    In the storing, transportation and treatment of the waste created by its cannery, Defendant causes noxious odors to be emitted into the surrounding community.

24.    A properly operated, maintained, and managed Facility will collect, capture and destroy odors to prevent such odors from escaping into the ambient air as fugitive emissions.

25.    Defendant is required to control its odorous emissions by, among other things, following proper practices, utilization of odor control technologies, and installing, operating, and maintaining systems for the routing, capture, removal, and elimination of the compounds that cause the emission of noxious odors.

26.    Defendant has failed to follow proper practices to prevent noxious off-site odor emissions and has failed to sufficiently collect, capture, and/or treat odors generated at its Facility, or by its operations, to prevent fugitive emissions and to otherwise prevent odors from the Facility from invading the homes and properties of Plaintiffs and the Class.

27.    Defendant's emissions have been the subject of frequent odor complaints from residents in the nearby residential area.

28.    Numerous households have contacted Plaintiffs' counsel documenting the odors they attribute to the Defendant's Facility and/or by its operations.

29.    Below is a small sampling of the factual allegations made by putative class members to Plaintiffs' counsel, demonstrating that the Facility, and/or Defendant's

**CLASS ACTION COMPLAINT**

operations are, the source and cause of the odor emissions, which have caused damages to neighboring properties.

    a.    Plaintiff, Joseph Vallejo, reported to Plaintiffs' counsel that "We didn't enjoy being in our backyard, turned us off to outdoor grilling. The odor is nauseating, extremely strong at times and so sad we couldn't enjoy our walks in the neighborhood."

    b.    Plaintiff, Victor Espericueta, reported to Plaintiffs' counsel that "I can't have my door nor windows open, can't sit outside and enjoy the summer evenings 24- for 3 months."

    c.    Putative class members, Estelito Veloso and Sophia Salvatera, reported that "Foul odor- can't enjoy our backyard for grilling & outdoor activities. Same for our front yard. We have to close our windows to prevent foul odor coming inside the house."

    d.    Putative class members, Eduardo and Jacqueline Espitia, reported that "Inability to go outside on some days in the backyard due to overwhelming stench from the facility. Avoid BBQ's, gardening or using patio."

30.    Defendant's well documented pattern of failing to control its emissions is further demonstrated by:

    a.    Defendant has received several Notices of Violation (NOV) from the Monterey Bay Air Resources District (MBARD) relating to its operation of the Facility and resultant odors, including the following:

        i.    On August 23, 2022, Defendant received an NOV for "[d]ischarge of air contaminants in such quantities as to constitute a public nuisance." This NOV was based on MBARD investigations performed on 8-12-22, 8-14-22 and 8-15-22 that found offsite nuisance odors.

        ii.    On November 8, 2023, Defendant was issued an NOV for multiple violations.

CLASS ACTION COMPLAINT

ARIAS SANGUINETTI WANG & TEAM LLP

       iii.    Additionally, Defendant received an NOV from the MBARD on April 18, 2024, for "[d]ischarge of air contaminants in such quantities as to constitute a public nuisance."

31.    Defendant's chronic emission of noxious odors has been the subject of significant media coverage.

### Defendant's Noxious Odor Emissions

32.    Defendant's Facility, and/or its operations, have repeatedly and continually emitted objectionable noxious odors that were detectable outside the bounds of its property.

33.    The noxious odors have caused negative impacts to Defendant's neighbors.

34.    Defendant's harmful, odorous emissions are continuing; Defendant has failed to cease the noxious emissions, despite knowledge, and despite the emissions being abatable with reasonable care and diligence.

35.    The noxious odors emitted by Defendant are offensive, would be offensive to a reasonable person of ordinary health and sensibilities, and have caused property damage, including by interfering with the ability of Plaintiffs and the Class to use and enjoy their homes and property.

36.    Plaintiffs and the putative class are a limited subset of individuals in San Benito County, and the proposed Class Area, that includes only owner/occupants and renters of residential property who live within the Class Area and fit within the Class Definition.

37.    The proposed Class Area is home to a wide range of commercial and recreational enterprises, including but not limited to retail trade, health care & social assistance, education and dining.

38.    Members of the public, including but not limited to business owners, inmates, employees, commuters, visitors, customers, clients, students, and patients, have experienced and been harmed by the fugitive noxious odors emitted by Defendant into public spaces; however, unlike Plaintiffs and the putative class, members of the public who

CLASS ACTION COMPLAINT

are outside of the Class Definition have not suffered damages of the same kind, in the form of diminished property values and/or loss of use and enjoyment of their private property.

39.    The invasion of Plaintiffs' property and that of the Class by noxious odors has reduced the value of and interfered with the use and enjoyment of those properties, resulting in damages well in excess of $5,000,000.

## CLASS ALLEGATIONS

### A. Definition of the Class

40.    Plaintiffs bring this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification, pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek to represent a Class of persons defined as:

> **All owner/occupants and renters of residential property who, within three years of filing the complaint, resided within the following area: San Benito River to the west, Nash Road to the south, Prospect Avenue to the east, north to S Street and then north on McCray to 4th Street.**

The definitional boundary is subject to modification as discovery will disclose the location of all persons properly included in the Class ("Class Members"). Plaintiffs reserve the right to propose one or more sub-classes if discovery reveals that such subclasses are appropriate.

41.    This case is properly maintainable as a class action pursuant to and in accordance with Federal Rule of Civil Procedure 23 in that:

a.    The Class, which includes thousands of members, is so numerous that joinder of all members is impracticable;

b.    There are substantial questions of law and fact common to the class including those set forth in greater particularity herein;

c.    Questions of law and fact such as those enumerated below, which are all common to the class, predominate over any questions of law or fact affecting only individual members of the class;

CLASS ACTION COMPLAINT

ARIAS SANGUINETTI WANG & TEAM LLP

ARIAS SANGUINETTI WANG & TEAM LLP

d.  A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

e.  The relief sought in this class action will effectively and efficiently provide relief to all members of the class;

f.  There are no unusual difficulties foreseen in the management of this class action; and

g.  Plaintiffs, whose claims are typical of those of the Class, through their experienced counsel, will zealously and adequately represent the Class.

### B. Numerosity

42.    The approximate number of residential households within the proposed Class Area is over 5,000.

43.    The Class consists of thousands of members and therefore is so numerous that joinder is impracticable.

### C. Commonality

44.    Numerous common questions of law and fact predominate over any questions affecting individual Class Members, including, but not limited to the following:

a.  Whether and how Defendant negligently and knowingly failed to reasonably construct, maintain and operate the Facility to prevent off-site odor emissions;

b.  Whether Defendant owed any duties to Plaintiffs;

c.  Which duties Defendant owed to Plaintiffs;

d.  Which steps Defendant has and has not taken in order to control the emission of noxious odors through the construction, maintenance and operation of its Facility;

e.  Whether and to what extent Defendant's noxious odors were dispersed over the Class Area;

CLASS ACTION COMPLAINT

ARIAS SANGUINETTI WANG & TEAM LLP

f.      Whether it was reasonably foreseeable that Defendant's failure to properly construct, maintain and/or operate the Facility would result in an invasion of Plaintiffs' property interests;

g.      Whether the degree of harm suffered by Plaintiffs and the Class constitutes a substantial annoyance or interference; and

h.      The proper measure of damages incurred by Plaintiffs and the Class.

**D. Typicality**

45.    Plaintiffs have the same interests in this matter as all the other members of the Class and their claims are typical of all members of the Class. If brought and prosecuted individually, the claims of each Class Member would require proof of many of the same material and substantive facts, utilize the same complex evidence including expert testimony, rely upon the same legal theories and seek the same type of relief.

46.    The claims of Plaintiffs and the other Class Members have a common cause and their damages are of the same type. The claims originate from the same failure of the Defendant to properly construct, repair, maintain and/or operate the Facility.

47.    Class Members have similar injuries to the Plaintiffs as a result of the invasion of their properties by Defendant's release of noxious odors causing damage to their properties.

**E. Adequacy of Representation**

48.    Plaintiffs' claims are sufficiently aligned with the interests of the absent Class Members to ensure that the Class' claims will be prosecuted with diligence and care by Plaintiffs as representatives of the Class. Plaintiffs will fairly and adequately represent the interests of the Class and do not have interests adverse to the Class.

49.    Plaintiffs have retained the services of counsel who are experienced in complex class action litigation and in particular class actions stemming from invasions of Facility emissions. Plaintiffs' counsel will vigorously prosecute this action and will

CLASS ACTION COMPLAINT

1    otherwise protect and fairly and adequately represent Plaintiffs and all absent Class

2    Members.

### F.  Class Treatment Is the Superior Method of Adjudication

50.    A class action is superior to other methods for the fair and efficient

adjudication of the controversies raised in this Complaint because:

a.    Individual claims by the Class Members would be impracticable as the costs of pursuit would far exceed what any one Class Member has at stake;

b.    Little or no individual litigation has been commenced over the controversies alleged in this Complaint and individual Class Members are unlikely to have an interest in separately prosecuting and controlling individual actions;

c.    The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

d.    The proposed class action is manageable.

51.    The prosecution of separate actions by or against individual members of the

Class  would create the risk of (i) inconsistent or varying adjudications with respect to

individual members of the Class, which could establish incompatible standards of conduct

for the party opposing the Class; and (ii) adjudications with respect to individual members

of the Class which would as a practical matter be dispositive of the interests of the other

members not parties to the adjudications or substantially impair or impede their ability to

protect their interests.

52.    Notice can be provided to members of the Class by U.S. Mail and/or

publication.

53.    Class treatment of Plaintiffs' claims is appropriate and necessary to ensure

that common relief is available to the Class and that Class Members can vindicate their

rights in a single proceeding.

CLASS ACTION COMPLAINT

ARIAS SANGUINETTI WANG & TEAM LLP

### CAUSES OF ACTION I AND II
### PUBLIC AND PRIVATE NUISANCE

54.    Plaintiffs restate the allegations set forth in all previous paragraphs of this Complaint as if fully rewritten herein.

55.    The noxious odors which entered Plaintiffs' property originated from the Facility constructed, maintained and/or operated by Defendant.

56.    The noxious emissions were created as a result of intentional and affirmative acts taken by the Defendant.

57.    The odors invading Plaintiffs' property are indecent and/or offensive to the senses, and obstruct the free use of his property so as to interfere with the comfortable enjoyment of life and/or property, including by preventing him from using and enjoying the outdoor spaces of his property.

58.    Plaintiffs did not consent for noxious odors to enter onto their land and property.

59.    Defendant owed and continues to owe a duty to Plaintiffs and the putative class to take positive action to prevent and/or abate the interference with common public rights and/or the invasion of the private interests of the Plaintiffs.

60.    By constructing and then failing to reasonably repair, maintain, and/or operate its Facility, Defendant has negligently created an unreasonable risk of foreseeable harm by causing the invasion of Plaintiffs' property by noxious odors and pollutants.

61.    As a foreseeable, direct and proximate result of the foregoing conduct of Defendant, Plaintiffs suffered injuries and damages to their property including through interference with the use and enjoyment of private property, loss of property values, and adverse impacts on property values.

62.    The injuries and damages suffered by Plaintiffs are specially injurious to themselves given the impacts to their property, as compared with the general public impacted by the odors, whose injuries do not include private property damage.

CLASS ACTION COMPLAINT

63.     The Class Area is home to a wide range of commercial and recreational activities, including but not limited to manufacturing, construction, retail trade, ministry, education, dining, and lodging.

64.     Plaintiffs and the Class are a limited subset of individuals in San Benito County and the Class Area, that includes only owner/occupants and renters of residential property located within the proposed Class Area and fit within the Class Definition.

65.     Members of the public, including but not limited to businesses, employees, commuters, tourists, visitors, customers, clients, and students have experienced and been harmed by the noxious odors emitted by Defendant into public spaces; however, unlike Plaintiffs and the Class, members of the public have not suffered damages of the same kind, in the form of diminished property values and/or loss of use and enjoyment of their private property.

66.     The nuisance conditions created by Defendant are abatable with reasonable care, effort, and diligence.

67.     The nuisance conditions created by Defendant are continuing, as they arise intermittently and can be abated with reasonable diligence.

68.     By causing noxious odors produced and controlled by Defendant to physically invade Plaintiffs' land and property, Defendant intentionally, recklessly, and/or negligently created a nuisance which substantially and unreasonably interfered with Plaintiffs' comfortable use and enjoyment of their property and caused the values of said property to diminish.

69.     Whatever social utility the Facility's operations provides is clearly outweighed by the harm suffered by Plaintiffs and the putative class, who have on frequent occasions been deprived of the full use and enjoyment of their properties and have been forced to endure substantial loss in the value of their properties.

70.     Defendant's substantial and unreasonable interference with Plaintiffs' use and enjoyment of their property and diminution of property values constitutes a nuisance

CLASS ACTION COMPLAINT

ARIAS SANGUINETTI WANG & TEAM LLP

for which Defendant is liable to Plaintiffs for all damages arising from such nuisance, including compensatory, exemplary, and injunctive relief.

## CAUSES OF ACTION III
### NEGLIGENCE

71.    Plaintiffs restate the allegations set forth in all previous paragraphs of this Complaint as if fully rewritten herein.

72.    On occasions too numerous to mention, Defendant negligently and improperly maintained and/or operated its Facility, allowing excessive fugitive noxious odor emissions to escape.

73.    Defendant owed and continues to owe a duty to Plaintiffs and the putative class, as neighboring residents with private property interests, to prevent and abate the interference with, and the invasion of, their private property interests.

74.    By failing to properly construct, maintain and/or operate its Facility, and follow proper practices, Defendant failed to exercise its duty of ordinary care and diligence so that noxious odors would not invade and damage Plaintiffs' property.

75.    As a direct and proximate result of Defendant's negligence in maintaining and/or operating the Facility, Plaintiffs' properties were physically invaded by noxious odors on occasions too numerous to list individually.

76.    As a further direct and proximate result of the foregoing conduct of Defendant, Plaintiffs suffered damages to their property as alleged herein. Such damages include, but are not limited to, diminution in the value of Plaintiffs' property and the interference with the right of use and enjoyment of Plaintiffs' property.

77.    By failing to construct, maintain and/or operate its Facility, Defendant has caused the invasion of Plaintiffs' property by noxious odors.

78.    Defendant knowingly breached its duty to exercise ordinary care and diligence when it improperly constructed, maintained and/or operated its Facility and knew,

CLASS ACTION COMPLAINT

1  or should have known upon reasonable inspection that such actions would cause Plaintiffs'
2  property to be invaded by noxious odors.

3      79.     As a direct and proximate result of the failure of Defendant to exercise
4  ordinary care, Plaintiffs' residences have been and continue to be physically invaded by
5  noxious odors.

6      80.     Defendant's conduct in causing noxious odors to invade Plaintiffs' property
7  has caused damages to Plaintiffs' property, as alleged herein, and Plaintiffs seek all
8  damages allowed by law, including, but not limited to, compensatory, exemplary, and
9  injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, pray
for judgment as follows:

A.    Certification of the proposed Class pursuant to Federal Rule of Civil
      Procedure 23;

B.    Designation of Plaintiffs as the representatives of the proposed Class and
      designation of his counsel as Class Counsel;

C.    Judgment in favor of Plaintiffs and the Class Members and against
      Defendant;

D.    An award, to Plaintiffs and the Class, of compensatory damages, including
      pre-judgment and post-judgment interest thereupon;

E.    An Order holding that entrance of the aforementioned noxious odors upon
      Plaintiffs' property constituted a nuisance;

F.    An Order holding that Defendant was negligent in causing property damages
      to Plaintiffs and the Class, causing damages to property.

Page 14

**CLASS ACTION COMPLAINT**

ARIAS SANGUINETTI WANG & TEAM LLP

G.    Injunctive relief not inconsistent with Defendant's federally and state enforced air permits;

H.    An award of attorney fees and costs; and

I.    Such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:    September 27, 2024            **ARIAS SANGUINETTI WANG**
                                        **& TEAM LLP**


                            By:    */s/ Mike Arias, Esq.*
                                   Mike Arias, Esq.
                                   Arnold C. Wang, Esq.

                            **LIDDLE SHEETS P.C.**

                                   Steven D. Liddle, Esq.
                                   Laura L. Sheets, Esq.
                                   D. Reed Solt, Esq.

                                   *Attorneys for Plaintiffs and the Putative Class*

CLASS ACTION COMPLAINT